## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## WESTERN DIVISION

| | |
|---|---|
| SMITHFIELD PACKAGED MEATS SALES CORP., a Delaware Corporation, | Case No. |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| DIETZ & WATSON, INC., a New Jersey Corporation; CHRIS CONRAD, an Individual, | |
| Defendants. | |

Plaintiff Smithfield Packaged Meats Sales Corp. ("Smithfield") for its Complaint, states as follows:

### NATURE OF THE ACTION

1.      This is an action for trade secret misappropriation in violation of the federal Defend Trade Secrets Act and Iowa Uniform Trade Secrets Act, intentional interference with contractual relations, breach of fiduciary duties, breach of contract, and civil conspiracy.

### PARTIES

2.      Smithfield is a Delaware corporation with its principal place of business in Smithfield, Virginia.

3.      Defendant Dietz & Watson, Inc. ("D&W") is a New Jersey corporation with its principal place of business in Philadelphia, Pennsylvania.

4.      Defendant Chris Conrad ("Conrad") (together with D&W, "Defendants") is an individual who resides in Atlantic, Iowa, and is a citizen of Iowa.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction pursuant to pursuant to 28 U.S.C. § 1331 because this action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and because the relevant trade secrets are related to products or services used in, or intended for use in, interstate or foreign commerce.  The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Smithfield's state and common law claims.

6.      The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interests and costs.

7.      The Court has personal jurisdiction over Conrad because he is a citizen of Iowa. The Court has personal jurisdiction over D&W because it has continuous and systematic contacts with this state through its provision of goods and services throughout the state.  In addition, this Court has personal jurisdiction over D&W because it committed, conspired to commit, and or/ aided and abetted, acts within Iowa and this judicial district that gave rise to this action, including but not limited to acts through its agent, Conrad.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## RELEVANT FACTS

### Smithfield's Background

9.      Smithfield is a subsidiary of Smithfield Foods, Inc., the world's largest producer of pork products.  Smithfield's sister company, Smithfield Packaged Meats Corp., produces billions of pounds of fresh and packaged pork products annually, including deli products packaged under many different brand names that Smithfield sells.

10.     Smithfield sells various deli products to retail customers (*e.g.*, grocery stores) and food service customers (*e.g.*, restaurants).  Smithfield sells deli products through a number of brands, including its premium deli meats and cheeses brand, Kretschmar.

11.     One of Smithfield's sales channels is through food wholesalers/distributors, including Associated Wholesale Grocers ("AWG").

12.      As part of its deli business, Smithfield enters into confidential agreements with grocery store customers to provide various deli products.  These contracts typically have one- to three-year terms, and contain various provisions addressing monetary compensation, marketing and merchandizing support, sales volume, and sales incentives, among other confidential terms.

13.     Smithfield also enters into confidential agreements and arrangements with wholesalers/distributors governing the sales of its deli products.  Confidential terms in conjunction with these agreements and arrangements include product prices, volumes, and margins.

**Conrad's Employment with Smithfield**

14.     John Morrell & Co., a subsidiary of Smithfield Foods, Inc., hired Conrad on or about July 30, 2007.  Following his hire, Smithfield Foods, Inc. reorganized its corporate structure, which included changing John Morrell & Co.'s name to Smithfield Packaged Meats Corp. ("SPMC"), incorporating Smithfield as a wholly-owned subsidiary of SPMC, and transferring SPMC's sales employees, including Conrad, and all relevant assets, obligations and contracts to Smithfield.  Thus, at all relevant times for purposes of this action, Conrad worked for Smithfield.

15.     At all relevant times, Conrad worked remotely from his home in Atlantic, Iowa and traveled to various Smithfield offices/facilities and Smithfield distributor and customer locations throughout the United States.

16.     During the relevant time period, Smithfield employed Conrad as a Deli Sales Director for the Central and South portions of the United States.  In his role, Conrad was responsible for, among other things, the following:  negotiating, drafting, and executing contracts on behalf of Smithfield with its customers; negotiating, drafting, and executing contracts on behalf of Smithfield with its wholesalers/distributors; developing strategies to increase sales; determining product pricing and otherwise setting pricing strategies; determining promotional strategies; managing client relationships; and coordinating with operations staff and internal Smithfield partners regarding production, quality, and other customer-related issues.

17.     Conrad oversaw and consulted on accounts that generated tens of millions of dollars in annual sales for Smithfield.

18.     Conrad acted as Smithfield's "deli expert," particularly for the Central and South portions of the United States.

19.     Because of his high-level position and duties with Smithfield, Conrad owed Smithfield duties of loyalty, trust, confidence, full disclosure, and utmost good faith for all matters connected to his employment.

20.     During his tenure with Smithfield, Conrad had access to a broad range of Smithfield's confidential, proprietary, and trade secret information ("Smithfield Confidential Information"), including, but not limited to, the following:

      i.     Identification of and information regarding Smithfield's customers and prospective customers;

     ii.     Customer purchasing history, including products, volume, and prices;

     iii.     The terms of the contracts between Smithfield and its grocery store customers and wholesalers/distributors;

     iv.     Information on new product development initiatives for customers and prospective customers;

     v.     Pricing and margin information and strategies;

     vi.     Financial information; and,

     vii.     Sales and marketing plans.

21.     The Smithfield Confidential Information is accessible to a limited number of Smithfield employees on a need-to-know basis.  Smithfield takes steps to ensure the confidentiality of the Smithfield Confidential Information in several ways including, but not limited to, the following:

     i.     Smithfield physically secures its processing plants.  Entrance to buildings is further limited to Smithfield employees with appropriate access badges depending on the type of building.  All visitors must sign in with security, present a valid government-issued picture identification, and are subject to a search.  Only visitors with a legitimate business purpose are allowed on the property and, even if allowed on the property, are limited to certain areas and by escort of select Smithfield employees only.

     ii.     Smithfield further limits access to confidential, proprietary, and trade secret information on its network operating system.  Only Smithfield employees have access to its computer network.  Employees do not receive full access to all information on the network operating system.  Instead, managers must

request access for employees to information that permits them to perform the specific responsibilities of their position.

iii.    Smithfield further limits access to sensitive financial and pricing information by maintaining and storing such information on a secured enterprise computer system, and limits access to these systems by only granting credentials to view the information to those employees with a need to know such information.

iv.    Managers review distribution lists periodically to ensure that only individuals with a need-to-know the distributed information receive the information.

v.    Managers periodically change call-in numbers and access codes used for conference calls during which confidential, proprietary, and trade secret information is discussed.

22.    The steps outlined in the preceding paragraph were and are followed with respect to the Smithfield Confidential Information at issue in this matter.

23.    Smithfield developed the Smithfield Confidential Information using significant resources and time, for its own benefit.

24.    Smithfield maintains several policies with respect to the use and dissemination of the Smithfield Confidential Information.

25.    Specifically, Smithfield employees are required to comply with Smithfield's Code of Business Conduct and Ethics ("Code of Conduct").  At various times during his employment, Conrad acknowledged receipt of the Code of Conduct in effect at that time.

26.    The current version of Smithfield's Code of Conduct, which was in effect at the

time of his resignation, states as follows:

> For Smithfield's trade secrets and other confidential information, it
> is critical that our employees hold them in strict confidence and not
> disclose or use them outside of Smithfield without the protections
> of a confidentiality agreement. Further, employees are prohibited
> from using or inducing others to use trade secrets and confidential
> information that belongs to other parties, such as former employers
> or competitors, without authorization from the owners of that
> information. Employees also must strictly adhere to the
> confidentiality obligations related to information received from
> third parties under a confidentiality agreement as part of their
> employment with Smithfield.
>
> All Smithfield employees have a duty of loyalty to the
> company. If your employment with Smithfield ends for any
> reason, you must return immediately to Smithfield all intellectual
> property, confidential information, trade secrets and other Smithfield
> property in your possession. In addition, you must continue to hold
> in strict confidence Smithfield's trade secrets and other confidential
> information. You may not use it for any purpose, including in
> any future business venture, new employment, or other commercial
> or non-commercial purpose.

27.    Conrad signed a series of documents underscoring the confidential nature of the

Smithfield Confidential Information, including an Employee's Patent and Trade Secret

Agreement, a Business Ethics Acknowledgement, and Technology Policy. These documents are

attached hereto as Exhibit A, and Smithfield incorporates them herein by reference.

28.    Conrad received and signed the Employee's Patent and Trade Secret Agreement,

which states in relevant part:

> 1.    *Discoveries, Inventions, Ideas and Improvements by Employee.* Employee
> will promptly disclose to [Smithfield] all discoveries, inventions, ideas or
> improvements relating to the business of [Smithfield] or resulting from or
> suggested by any work done by Employee pursuant to employment with
> [Smithfield] during or within one year after Employee's termination of employment
> by [Smithfield]. To the extent permitted by law, all such discoveries inventions
> ideas and improvements which result from such work or relate in any way to
> [Smithfield's] business shall be the sole and exclusive property of [Smithfield] and

Employee shall perform all actions reasonably requested by [Smithfield] to establish and confirm such ownership.

    2.    *Maintenance of Trade Secrets, Proprietary and Confidential Information*. Employee recognizes that as a result of Employee's employment by [Smithfield], Employee has in the past, or may in the future, develop, obtain and learn about [Smithfield's] trade secrets or other confidential or proprietary information concerning [Smithfield].  Employee agrees to use the utmost diligence to guard and protect said trade secrets, proprietary and confidential information.  Employee will not, during or after the period of employment with [Smithfield], use, except for the benefit of [Smithfield], or divulge to others, any of [Smithfield's] trade secrets, proprietary or confidential information which Employee may develop, obtain or learn about during or as a result of Employee's employment by [Smithfield], unless authorized to do so by [Smithfield] in writing.  Employee further agrees that if Employee's employment by [Smithfield] is terminated for any reason, Employee will not take, but will leave with [Smithfield], all records and papers and all matter of whatever nature which bears [Smithfield's] trade secrets, proprietary or confidential information.

For the purpose of this Agreement, the terms "trade secrets", "proprietary information" and "confidential information" include processes, methods, techniques, systems, formulas, patterns, models, devices, compilations, computer software programs, lists of customers, business arrangements or any other information of whatever nature which gives to [Smithfield] an opportunity to obtain an advantage over its competitors who do not know or use it, but it is understood that said terms do not include knowledge, skills or information which is common to the trade or profession of Employee or already known to the general public.

    29.    Conrad received and signed the Business Ethics Acknowledgment, which states in

relevant part:

Employees will maintain the highest ethical standards by conducting Company business with integrity and complying with all applicable laws in a manner that excludes consideration of personal advantage or gain.

. . .

- Employees must treat the following types of information as confidential and thus share only with appropriate personnel internally and then only on a strictly need-to-know basis.
  - o Proprietary Information
  - o Procurement Ethics
  - o Sales Information
  - o Company Records
  - o Employee Records
  - o Company Funds

       o   Company Property
       o   Electronic Data

30.     Conrad received and signed the Technology Policy, which states in relevant part:

The Company's policy against disclosure of Company trade secrets and confidentiality or proprietary information applies to use of the Technology. Sensitive or confidential information should not be communicated externally using the Technology unless security safeguards are in place.

. . .

Employees using the Technology must respect and avoid infringing the intellectual property rights of others, including but not limited to: copyrights, trademark rights, patent rights, trade secret rights, publicity and privacy rights. Copying material from web sites without permission may be copyright infringement. Use of the Technology to violate third-party intellectual property rights is strictly prohibited.

Violations of this policy can, depending on the degree and nature of the violation, subject the employee to discipline up to and including termination of employment.

**Conrad Submits Resignation and Smithfield Discovers that Conrad Is Using Smithfield Confidential Information to Interfere with Agreements with Smithfield Customers**

31.     On October 25, 2019, Conrad submitted his resignation and provided two weeks' notice. Around that same time, Conrad informed various people at Smithfield that he was going to work for D&W.

32.     On October 25, 2019, Smithfield accepted Conrad's resignation and, because Conrad was going to work for a competitor, informed him that although Smithfield would pay him for his final two weeks, October 25, 2019 would be his final day of work and that he would no longer perform any duties for Smithfield.

33.     That same day, October 25, 2019, Smithfield's Corporate Human Resource Manager, Rachel Johnston ("Johnston"), conducted an exit interview with Conrad. During that conversation, Johnston confirmed that Conrad was being separated that same day, however, Smithfield would continue to pay him his normal salary through the two-week notice period.

34.     During the exit interview, Johnston discussed with Conrad the Smithfield-owned equipment and materials in his possession.  Conrad disclosed to Johnston that he had a laptop, cell phone, credit card, and company car in his possession.  At no point did Conrad disclose that he had over a thousand pages of Smithfield's documents, many which contained Smithfield Confidential Information.  Nor did Conrad disclose that, on that same day, he transferred files containing Smithfield Confidential Information onto an external USB device or drive (*i.e.*, a thumb drive/USB device).

35.     During the exit interview, Johnston reminded Conrad that the Code of Conduct would still apply to certain conduct, and that he was still bound by the confidentiality/non-disclosure agreements he previously signed.

36.     Because Conrad worked remotely from his home in Iowa, Johnston arranged for Conrad to turn in his Smithfield-issued laptop, cell phone, car, credit card, and other company property on November 1, 2019 at Smithfield's Kansas City, Missouri office, which is the earliest date that Conrad was able to travel to the Kansas City office.

37.     On November 1, 2019, Conrad reported to Smithfield's Kansas City office.  Once there, he returned his Smithfield-issued laptop, iPhone, and credit card to Linda Trask ("Trask"), Smithfield's Senior IT Desktop Support Analyst.  At no point did Conrad tell Trask that he had an external USB device or drive containing Smithfield's Confidential Information that he was not returning.  Nor did Conrad tell Trask that he had over a thousand pages of Smithfield's documents, many of which contained Smithfield Confidential Information.

38.     On or about November 4, 2019, Conrad began employment with D&W.  D&W is Smithfield's direct competitor in the sale of deli products.

39.     On information and belief, Conrad's role with D&W is identical, or nearly identical, to his responsibilities at Smithfield.

40.     Conrad told at least one of his former Smithfield colleagues that he will be soliciting Smithfield's customers, including those that he directly serviced while employed by Smithfield.

41.     On or about November 19, 2019, Smithfield discovered that Conrad, on behalf of D&W and as D&W's agent, was contacting and meeting with Smithfield's customers (i) with whom he had negotiated sales agreements for Smithfield during his employment with Smithfield, (ii) that had binding contracts with Smithfield, and (iii) for whom he possessed Smithfield Confidential Information. On information and belief, D&W was aware of, directed, endorsed, and aided and abetted Conrad's actions in misappropriating Smithfield Confidential Information and interfering with Smithfield's existing customer contracts. On information and belief, D&W conspired with Conrad to misappropriate Smithfield Confidential Information and interfere with Smithfield's existing customer contracts.

42.     Customer A[1] was the largest, by sales and volume, of Smithfield's customers that Conrad serviced during his employment with Smithfield. As a result, Customer A was a prime target for Conrad as he was working to build a customer portfolio on behalf of D&W.

43.     Smithfield had a three-year written contract with Customer A that began on November 1, 2019 and ended on October 31, 2022. Pursuant to that contract, Smithfield provided Customer A, through its distributor, annually with almost two million pounds of deli

---

[1]     In the interests of mitigating the damage that Conrad has already caused to Smithfield's contracts and relationships with its customers and Smithfield's customers' privacy, Smithfield will use pseudonyms for its customers in this Complaint. Smithfield is willing to disclose the names of these customers to the Court to review *in camera* and to Defendants once the parties enter into a protective order.

products on specific terms and conditions.  Smithfield's contract with Customer A was highly-confidential as it contained, among other things, confidential pricing terms.

44.    Conrad was intimately familiar with the length and terms of the contract because he negotiated it only months before his resignation, along with another Smithfield employee. Conrad only knew the terms of Smithfield's agreement with Customer A due to his high-level position and duties with Smithfield, and his access to Smithfield Confidential Information.

45.    Through a series of conversations beginning on or about November 19, 2019, Customer A informed Smithfield that, despite their binding contract with Smithfield, which the parties had already begun performing, they had received an offer from D&W to replace the Smithfield contract.  On information and belief, D&W was acting through its agent, Conrad. D&W proposed to provide nearly identical products to Customer A, but would do so on terms that were more lucrative to Customer A.

46.    Customer A told Smithfield that it was seriously considering accepting the offer, among other things.  The clear implications from Smithfield's conversations with Customer A were that Smithfield needed to improve the deal or it would immediately lose the business, despite the three-year agreement Customer A had with Smithfield.

47.    As a direct result of Defendants' contractual interference, Smithfield was forced to renegotiate the contract, increasing its compensation to Customer A.

48.    Customer B has a binding contract with Smithfield through December 2020. Recently, Customer B informed Smithfield that it would cease purchasing deli products from Smithfield effective March 1, 2020.  Based on its conversations with Customer B, Smithfield alleges Customer B's decision is the result of Defendants using the same unlawful scheme that they used regarding Customer A.

49.    Customer C has a binding contract with Smithfield through January 2021. Recently, Customer C informed Smithfield that they had received an offer from D&W to replace the Smithfield contract.  On information and belief, D&W was acting through its agent, Conrad. D&W proposed to provide nearly identical products to Customer C, but would do so on terms that were more lucrative to Customer C.  Customer C told Smithfield that it was seriously considering accepting the offer, among other things.  The clear implications from Smithfield's conversations with Customer C were that Smithfield needed to improve the deal or it would immediately lose the business.

50.    As a direct result of Defendants' contractual interference, Smithfield was forced to renegotiate the contract, increasing its compensation to Customer C.  Based on its conversations with Customer C, Smithfield alleges Customer C's decision is the result of Defendants using the same unlawful scheme that they used regarding Customers A and B.

51.    On information and belief, Conrad has attempted, and continues to attempt, to interfere with Smithfield's agreements with other customers that he serviced during his employment Smithfield.

52.    On information and belief, Conrad has told at least three Smithfield customers, Customers A, B, and C, that Smithfield intended to increase its deli product prices.  Conrad only knew of Smithfield's future pricing plans due to his high-level position and duties with Smithfield, and his access to Smithfield Confidential Information.  There were less than ten people within Smithfield who knew that Smithfield was planning a price change for its deli products, including Conrad.

53.    On information and belief, Conrad is also engaged in "negative recruiting" with multiple other Smithfield customers that he serviced during his employment with Smithfield.

One such customer, Customer B, informed Smithfield that Conrad contacted it and stated words to the effect of "all Smithfield cares about is money," "Smithfield is not the same company," and that Smithfield is suffering from a "different culture" that is negatively impacting the company.

54.    On information and belief, Conrad is working through the list of his former customers that he serviced during his employment with Smithfield using similar tactics, to unlawfully compete against Smithfield on behalf of D&W.  Defendants are unlawfully competing, and otherwise attempting to unlawfully compete, against Smithfield through their use of Smithfield Confidential Information of which Conrad had access during his employment with Smithfield.  On information and belief, Conrad was acting as D&W's agent, conspired with D&W, and D&W aided and abetted Conrad's unlawful acts to unlawfully misappropriate Smithfield Confidential Information while Conrad was still employed by Smithfield.

**Conrad's Suspicious Activities on Smithfield's Computer Systems in the Days and Weeks before His Resignation**

55.    After becoming aware of Conrad using Smithfield Confidential Information in an attempt to interfere with Smithfield's contracts with its customers and otherwise interfere with Smithfield's business relations, Smithfield sent the laptop that he used during his employment for a forensic data and use analysis.

56.    The forensic analysis found that, while he was still a Smithfield employee, Conrad began misappropriating Smithfield Confidential Information and engaged in other highly suspicious computer activity on Smithfield's computer systems.  This includes, but is not limited to, the following:

i.    On the morning of October 25, 2019 at 8:44 a.m. Central Daylight Time, 36 minutes before Conrad submitted his resignation, Conrad accessed a spreadsheet titled "Copy of 2020 ALL BRANDS price list Effective

12.29.19.xlsx" and transferred it a personal Lexar-brand USB/thumb drive, with serial number 04cn1afqfusw4wne (the "Lexar Drive"). This spreadsheet contains highly sensitive Smithfield Confidential Information regarding the prices, margins, and discounts, that it offers for its deli products, among other information.

ii.     On October 22, 2019, Conrad transferred a document called "DC'd item volume.xlsx" to the same Lexar Drive. This spreadsheet contains highly sensitive Smithfield Confidential Information regarding items that Smithfield had discontinued, was planning to discontinue, or was contemplating discontinuing. On information and belief, Conrad misappropriated this spreadsheet so that Conrad could poach any business left by gaps that would exist due to the discontinued items.

iii.    On October 22, 2019, Conrad transferred a backup of his Smithfield e-mail account .pst file to the same Lexar Drive. Conrad's e-mail contains highly sensitive Smithfield Confidential Information.

iv.     On September 16, 2019, Conrad accessed a presentation titled "AWG 2020 Clip Presentation.pptx" and transferred it the same Lexar Drive. This presentation contains highly sensitive Smithfield Confidential Information regarding, among other things, its product pricing and offers.

v.      On September 16, 2019, Conrad accessed a presentation titled "NEW Kretschmar Bulk Deli Pre-Sliced Specs 9-16-2019.pptx" and transferred it the same Lexar Drive. This presentation contains highly sensitive

Smithfield Confidential Information regarding, among other things, its product pricing and costs.

vi.  Conrad used his Smithfield laptop to access his iCloud account from the Chrome internet browser on October 29, 2019, four days after his resignation, which is the first time that he accessed the iCloud account from the laptop, and there is evidence of access to iCloud photos, iCloud contacts, iCloud notes, and iCloud calendar.

57.  Based on the internet activity that Smithfield discovered through the forensic analysis of his laptop, Conrad began negotiating in earnest his future employment with D&W on or about September 16, 2019.  Conrad also first began using his personal Lexar-brand external USB device or drive on or about September 16, 2019 to misappropriate Smithfield Confidential Information from Smithfield's computer systems and network.

58.  Conrad misappropriated these materials for himself, for the benefit of his new employer D&W, and to the detriment of Smithfield.

59.  Conrad had no legitimate Smithfield business reason to take this Smithfield Confidential Information and engage in these activities on Smithfield's computer systems and network, especially in the days leading to his resignation, the day he resigned, and after his resignation.

60.  While still employed by Smithfield, Conrad removed Smithfield Confidential Information from Smithfield, including information stored electronically on Smithfield's computers, computer network, and/or information technology systems.

61.    The Smithfield Confidential Information misappropriated by Defendants was developed by Smithfield through significant effort and substantial cost for use in its business by its employees for the exclusive benefit of Smithfield.

62.    Conrad has misappropriated Smithfield Confidential Information in violation of the Defend Trade Secrets Act. 18 U.S.C. 1836. *et seq.* and the Iowa Uniform Trade Secrets Act, Iowa Code Chapter 550, Smithfield's policies, and contrary to his fiduciary duties as provided by law.  If Defendants are permitted to continue to use and disclose Smithfield Confidential Information to third parties including Smithfield's competitors, Smithfield will suffer competitive harm and damage that is extremely difficult, if not impossible, to calculate, but could easily be in the millions of dollars annually.

63.    Injunctive relief and an order for Defendants to return immediately all of the Smithfield Confidential Information that he has misappropriated and is in his possession, accordingly, are necessary to prevent Smithfield from suffering irreparable harm.

**Conrad Returns a Treasure Trove of Misappropriated Files**

64.    Counsel for Smithfield and Defendants engaged in a series of written and telephonic conversations after Smithfield discovered their misconduct.  Smithfield demanded that Defendants return all of Smithfield's property, including files containing Smithfield Confidential Information.

65.    On January 8, 2020, Defendants' counsel provided Smithfield's counsel with approximately 1,300 pages of hard copy documents, many of which contained Smithfield Confidential Information regarding sales numbers, volumes, and margins, contracts with Smithfield's customers, among other relevant information.

66.    Conrad had not returned any of these materials when he left Smithfield.

67.     Conrad had not told Smithfield that he had any of these materials in his possession when he left Smithfield.

68.     On information and belief, Conrad retained these hard copy documents so that he could use the information to compete against and harm Smithfield following his departure, for the benefit of D&W.

69.     Notably, Defendants did not return Conrad's personal external device(s) to which he transferred Smithfield Confidential information in the days and weeks before his resignation.

70.     On information and belief, despite demanding that Defendants return all the misappropriated Smithfield property that they have, Defendants did not do so and continue to possess misappropriated Smithfield Confidential Information, including but not limited to the files on Conrad's personal Lexar-brand external device or drive.

**FIRST CLAIM**
**Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.**
**(Against All Defendants)**

71.     Smithfield incorporates all of the above paragraphs as though fully set forth herein.

72.     Smithfield owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This Smithfield Confidential Information includes, but is not limited to the items detailed in the aforementioned paragraphs.  None of these trade secrets are disclosed publicly or disseminated to anyone without a need to know.

73.     Smithfield's confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

74.     Smithfield has taken reasonable measures to keep such information secret and confidential.

75.     Smithfield has at all times maintained stringent security measures to preserve the secrecy of its trade secrets.

76.     Due to these security measures, Smithfield's confidential and proprietary trade secret information is not available for others in the deli industry – or any other industry – to use through any legitimate means.

77.     Smithfield's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

78.     In violation of Smithfield's rights, Defendants misappropriated Smithfield's confidential, proprietary, and trade secret information in the improper and unlawful manner as alleged herein.  Defendants' misappropriation of Smithfield's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Defendants have attempted and continue to attempt to conceal their misappropriation.

79.     On information and belief, if Defendants are not enjoined, Defendants will continue to misappropriate and use Smithfield's trade secret information for their own benefit and to Smithfield's detriment.

80.     As the direct and proximate result of Defendants' conduct, Smithfield has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Smithfield's remedy at law is inadequate, Smithfield seeks, in addition to damages, temporary,

preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Smithfield's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

81.     Smithfield has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorney's fees.

## SECOND CLAIM
### Violation of Iowa Uniform Trade Secret Act, Iowa Code Section 550.1 *et seq.*
### (Against All Defendants)

82.     Smithfield incorporates all of the above paragraphs as though fully set forth herein.

83.     The Smithfield Confidential Information at issue constitutes trade secrets as defined by Iowa's Uniform Trade Secrets Act.  Smithfield owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This Smithfield Confidential Information includes, but is not limited to the items detailed in the aforementioned paragraphs.  None of these trade secrets are disclosed publicly or disseminated to anyone without a need to know, and the information has actual or potential independent economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use.

84.     Smithfield has undertaken efforts that are reasonable under the circumstances to maintain the secrecy of the trade secrets at issue.

85.     Defendants knew or should have known under the circumstances that the information misappropriated by Defendants were trade secrets.

86.     Defendants misappropriated and threaten to further misappropriate trade secrets at least by acquiring trade secrets with knowledge of or reason to know that the trade secrets were acquired by improper means, and Defendants are using and threatening to use the trade secrets acquired by improper means without Smithfield's knowledge or consent.

87.     As a direct and proximate result of Defendants' conduct, Smithfield is threatened with injury and has been injured in an amount in excess of the jurisdictional minimum of this Court and that will be proven at trial.  Smithfield has also incurred, and will continue to incur, additional damages, costs and expenses, including attorney's fees, as a result of Defendants' misappropriation.  As a further proximate result of the misappropriation and use of Smithfield's trade secrets, Defendants were unjustly enriched.

88.     The aforementioned acts of Defendants were willful and malicious.  Smithfield is therefore entitled to exemplary damages under Iowa Code Section 550.4(2).

89.     Defendants' conduct constitutes transgressions of a continuing nature for which Smithfield has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, Defendants will continue to retain and use Smithfield's trade secret information to enrich themselves and divert business from Smithfield.  Smithfield is entitled to an injunction against the misappropriation and continued threatened misappropriation of trade secrets as alleged herein and further asks the Court to restrain Defendants from using all trade secret information misappropriated from Smithfield and to return all trade secret information to Smithfield.

90.     Pursuant to Iowa Code Section 550.6 and related law, Smithfield is entitled to an award of attorneys' fees for Defendants' willful and malicious misappropriation of trade secrets.

**THIRD CLAIM**
**Intentional Interference with Existing Contract**
**(Against All Defendants)**

91.     Smithfield incorporates all of the above paragraphs as though fully set forth

herein.

92.     Smithfield had contracts with certain third-party customers, including but not

limited to Customers A and B.

93.     Defendants knew of the relevant contracts.

94.     Conrad knew of the contracts because he negotiated and drafted many of them

and/or because they were for the customers he serviced when he was employed by Smithfield.

95.     On information and belief, D&W conspired with and/or aided and abetted Conrad

to interfere with these contracts and that Conrad informed D&W about them.

96.     Conrad, at all relevant times was acting as D&W's agent in the course of his

employment.

97.     Defendants intentionally and improperly interfered with these contracts, in part by

using Conrad's knowledge of Smithfield Confidential Information to unlawfully compete with

Smithfield.

98.     Defendants' interference caused the third-parties not to perform, or made

performance more burdensome or expensive.

99.     As a direct and proximate result of Defendants' conduct, Smithfield is threatened

with injury and has been injured in an amount in excess of the jurisdictional minimum of this

Court and that will be proven at trial.

100.     Defendants' conduct constitutes transgressions of a continuing nature for which

Smithfield has no adequate remedy at law.  Unless and until enjoined and restrained by order of

this Court, Defendants will continue to retain and use the Smithfield Confidential Information to enrich themselves and divert business from Smithfield by interfering with its contracts. Smithfield is entitled to an injunction against Defendants' interference.

## FOURTH CLAIM
### Breach of Fiduciary Duties
### (Against Conrad)

101.    Smithfield incorporates all of the above paragraphs as though fully set forth herein.

102.    As a Sales Director, Conrad was a key employee and owed certain duties to Smithfield, including, but not limited to, the fiduciary duties of undivided loyalty, trust, confidence, full disclosure and utmost good faith for all matters connected to his employment with Smithfield.

103.    Conrad was also bound to the terms of Smithfield's Code of Conduct and the various non-disclosure agreements described above, all of which included confidentiality obligations with respect to Smithfield's confidential information.

104.    Conrad acknowledged that he read and agreed to comply with the rules and conditions set forth in the above policies.

105.    Conrad's continued employment with Smithfield was conditioned upon Conrad agreeing to abide by the terms of these policies, including their confidentiality obligations.

106.    Conrad breached his duties to Smithfield by, among other things, misappropriating Smithfield Confidential Information (which includes trade secrets and other confidential business information) and soliciting Smithfield's customers on behalf of his subsequent employer using his knowledge of the Smithfield Confidential Information.

107.    Conrad's wrongful conduct has caused immediate and ongoing irreparable harm to Smithfield.

108.    In committing the foregoing acts, Conrad acted willfully, wantonly, maliciously, and with utter indifference to Smithfield's rights.

109.    As a direct and proximate result of Defendants' conduct, Smithfield is threatened with injury and has been injured in an amount in excess of the jurisdictional minimum of this Court and that will be proven at trial.

**FIFTH CLAIM**
**Breach of Contract**
**(Against Conrad)**

110.    Smithfield incorporates all of the above paragraphs as though fully set forth herein.

111.    Smithfield and Conrad entered into the non-disclosure agreements described above, which constitutes contracts under Iowa law.  See Exhibit A.

112.    Smithfield has fully performed its obligations under the agreements.

113.    Conrad breached the agreements by wrongfully misappropriating and disclosing Smithfield Confidential Information to third parties, for his and D&W's benefit and to Smithfield's detriment.

114.    As a direct and proximate result of Conrad's conduct, Smithfield is threatened with injury and has been injured in an amount in excess of the jurisdictional minimum of this Court and that will be proven at trial.  As a further proximate result of the misappropriation and use of Smithfield's trade secrets, Defendants were unjustly enriched.

**SIXTH CLAIM**
**Civil Conspiracy**
**(Against All Defendants)**

115.    Smithfield incorporates all of the above paragraphs as though fully set forth herein.

116.    Defendants committed the wrongs described above, including misappropriating Smithfield Confidential Information for their benefit and to Smithfield's detriment and intentionally interfering with Smithfield's existing contracts.  D&W also conspired with and aided and abetted Conrad to breach the agreements and fiduciary duties he has with Smithfield

117.    Conrad participated in a conspiracy with D&W, and unknown other individuals employed by D&W to commit the wrongs described above.  Defendants knowingly and voluntarily entered into an agreement, express or implied, to commit the violations and torts described above.

118.    As a direct and proximate result of Defendants' conduct, Smithfield has incurred at least $950,000 in monetary damages and is continuing to be threatened with additional financial and reputational injury, among other things.

## PRAYER FOR RELIEF

Smithfield requests that that judgment be entered as follows:

1.    Judgment against Conrad for his breach of his fiduciary duties and breach of contract, and an award of damages to Smithfield in an amount to be proven at trial, including, but not limited to, any compensation (salary, bonuses, benefits, etc.) paid to Conrad for services while he was engaged in activities that breached his fiduciary duties to Smithfield.

2.    Judgment against Defendants for their violations of the Defend Trade Secrets Act and Iowa Trade Secrets Act, intentional interference with Smithfield's existing contracts, and civil

conspiracy, and an award of actual/compensatory damages, punitive damages, and damages in an amount equal to the amount that Conrad was unjustly enriched as a result of his misappropriation, along with Smithfield's full costs of forensic review and examination and Smithfield's attorneys' fees in an amount to be proven at trial.

3.      Because (1) Smithfield is likely to succeed on the merits; (2) there is the threat of irreparable harm or injury to Smithfield absent an injunction; (3) the balance between the harm to Smithfield in the absence of injunctive relief and the harm that the injunction's issuance would inflict upon Defendants favors Smithfield; and, (4) the public interest favors Smithfield; entry of a temporary restraining order, a preliminary injunction, and permanent injunction.

4.      Costs, attorneys' fees, pre-judgment and post-judgment interest; and,

5.      Any other relief as the Court may deem just, equitable, and proper.

Dated this 13th day of February, 2020

By:   */s/ Randall D. Armentrout*

**NYEMASTER GOODE PC**
Randall D. Armentrout
Email:  rdarmentrout@nyemaster.com
700 Walnut Street, Suite 1600
Des Moines, IA 50309
Phone:  (515) 283-8161
Fax:      (515) 283-8045

**HUNTON ANDREWS KURTH LLP**
Ryan M. Bates (*pro hac vice* forthcoming)
Email:  rbates@hunton.com
Jason P. Brown (*pro hac vice* forthcoming)
Email:  brownj@hunton.com
2200 Pennsylvania Avenue, NW
Washington, D.C. 20037-1701
Phone:  (202) 955-1500
Fax:      (202) 778-2201

*Attorneys for Plaintiff*
*Smithfield Packaged Meats Sales Corp.*